UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
THE MCGRAW-HILL COMPANIES, INC.,                :
                                                :
                                                :    OPINION &
              PLAINTIFF,                        :    ORDER
                                                :
              V.                                :    05 CIV. 112 (HB)
                                                :
INTERNATIONAL SECURITIES                        :
EXCHANGE, INC. AND THE OPTIONS                  :
CLEARING CORPORATION,                           :
                                                :
              DEFENDANTS.                       :
------------------------------------------------------------X
DOW JONES & COMPANY, INC.,                      :
                                                :    05 CIV. 4954 (HB)
              PLAINTIFF,                        :
                                                :
              V.                                :
                                                :
INTERNATIONAL SECURITIES                        :
EXCHANGE, INC. AND THE OPTIONS                  :
CLEARING CORPORATION,                           :
                                                :
              DEFENDANTS.                       :
------------------------------------------------------------X

**Hon. HAROLD BAER, JR., District Judge:**

This case comes before the Court on a Motion for a Preliminary Injunction and a Motion to Dismiss in two consolidated cases, Dow Jones & Co., Inc. v. Int'l Securities Exchange, Inc. and The Options Clearing Corp., Inc., No. 05 Civ. 4954 (S.D.N.Y.), and McGraw-Hill v. Int'l Securities Exchange, Inc. and the Options Clearing Corporation, No. 05 Civ. 112 (S.D.N.Y.). The Court has decided these motions together. For the reasons discussed below, Motion for a Preliminary Injunction is DENIED, and the Motion to Dismiss is GRANTED.

## I. BACKGROUND

### A. Procedural History

This action poses the question – can there be a valid property right in trading options on index-tracking stocks without a license from the index providers? In this case, the providers are, McGraw-Hill Companies, Inc. ("McGraw-Hill") and Dow Jones Co., Inc. ("Dow"). Each sells what are called exchange traded funds ("ETFs"), Standard & Poor's Depositary Receipts ("SPDRs") and DIAMONDS, respectively. SPDRS are comprised of the stocks included in the Standard & Poor's 500 Composite Stock Price Index ("S&P" or "S&P 500 Index") while DIAMONDS are comprised of the stocks included in the Dow Jones Industrial Average ("DJIA"). Defendants, International Stock Exchange, Inc. ("ISE") and the Options Clearing Corporation ("OCC") are anxious to offer their customers options to buy SPDR shares and DIAMONDS shares on the International Stock Exchange and argue they can do so with out a license.

On January 6, 2005, McGraw-Hill filed a complaint against ISE and OCC that alleges, misappropriation, trademark infringement, unfair competition, and trademark dilution of the intellectual property in SPDRs by Defendants.[1] The same day, a Temporary Restraining Order ("TRO") was sought and granted, and Defendants were enjoined from trading SPDR options. On January 31, 2005, McGraw-Hill filed a Motion for a Preliminary Injunction. Before the Court held a hearing, the parties stipulated to a temporary licensing arrangement that allows ISE to trade SPDRs options while the case is pending. The stipulation also dismissed OCC from the action. On March 8, 2005, ISE filed this Motion to Dismiss.

On May 24, 2005, Dow filed a similar complaint against ISE and OCC with virtually identical issues, i.e., does an intellectual property right exist with regard to option trades for the ETF, DIAMONDS. This Court issued a Temporary Restraining Order for DIAMONDS options. Unlike the McGraw-Hill action however, Dow and the Defendants have not stipulated to a temporary license that would permit trading in

---
[1] The claim against OCC for money had and received was voluntarily withdrawn by Plaintiff McGraw-Hill but remains part of Dow's Complaint.

DIAMONDS options because Dow had already sold an exclusive license to the Chicago Board Options Exchange, Inc. ("CBOE").

On June 6, 2005, the two actions were consolidated. A Preliminary Injunction hearing was held on June 8 and 13, 2005, and Plaintiff McGraw-Hill was permitted to submit a supplemental memo in opposition to the Motion to Dismiss. The motions currently sub judice, and resolved herein, are (1) Dow's Motion for a Preliminary Injunction against ISE and OCC, pursuant to Fed. R. Civ. P. 65(a), to enjoin ISE from trading DIAMONDS options, and (2) ISE's Motion to Dismiss McGraw-Hill's Complaint pursuant to Fed. R. Civ. P. 12(b).

### B.     Indexes, Exchange Traded Funds, and Options

The following facts are taken from the Complaints, documents on which the Complaints rely, public records, and the evidence presented at the Preliminary Injunction hearing.

Dow and McGraw-Hill are the creators and proprietors of securities indexes such as the DJIA and S&P 500, respectively. They own federal trademark registrations for a number of marks including DIAMONDS and SPDRs. Both the DJIA and S&P 500 consist of stocks meant to be a representative sample of U. S. stock market performance. Plaintiffs license their indexes.

An Exchange Traded Fund ("ETF") is an investment vehicle that allows investors to participate in the performance of an established market index without having to purchase the basket of individual stocks that comprise the index. ETFs bundle together securities that comprise a market index like the Dow Jones Industrial Average or the S&P 500 Index. An ETF is usually established as a unit investment trust; its portfolio consists of the bundle of stocks in an index, in proportion to their weight in the index. They are traded just like stocks or other marketable securities. The price and yield of ETFs are intended to follow the price and yield performance of the index. ETFs are issued by the index provider or by a separate entity that has entered into a licensing arrangement with

the index provider. Both SPDRs and DIAMONDS are initially issued by S&P and Dow respectively.

An option is essentially a contract that gives the holder the right, but not the obligation to buy or sell a specified security at a specified price, on or before a given date. An option to buy is a call option, an option to sell is a put option, and the specified price is known as the strike price. If an option is not exercised by a certain date, it expires with no value. Options are traded much like their underlying securities and on any marketable security, like an ETF, or on an index itself. Options on ETFs, like options on other equity, provide the right to buy or sell a unit of an ETF at a specified price on or before a specified time. The gravamen of this controversy is whether an exchange, like ISE, separate from the issuer of an ETF can offer to sell options on those ETFs without a license from S&P and Dow.

An index option is different from an ETF option because the underlying instruments are indexes and not marketable securities. Options traded on indexes are essentially options on the index number itself, which is an intangible, representative number. It is a value that changes over time as market prices fluctuate. An investor who purchases an index option obtains certain rights per the terms of the contract. In general, this includes the right to demand and receive a specified amount of cash from the writer of a contract with the same terms. When an option is traded on an index there is no underlying security attached to the option. ETF options are different from index options because they are fully settled when a share of an ETF is delivered, much the same way that options on stocks or other marketable securities are sold. ETFs may settle with cash in lieu of the transfer of the share or unit, but it is still connected to the performance of that share or unit and the possibility exists for the physical transfer of the asset when the put or call is exercised. Index options are always settled with the delivery of cash because there is no underlying security. The amount paid is the difference between the strike price and the cash value of the index at the time of settlement.

Plaintiffs claim that unlicensed trading of ETF options on other exchanges would violate their proprietary rights in their indexes.

## II. DISCUSSION

### A. Case Law

To succeed on any of their claims, Plaintiffs must show that they have a property or other protectible interest in ETF options after the options have been created and are sold on the market. Dow and McGraw-Hill rely on cases decided in the past twenty years where courts have found that a protectible interest existed. These cases recognize property rights in financial indexes and related trademarks and prohibit the unlawful misappropriation of such rights when a competitor creates an identical index or offers index-linked financial products such as futures contracts. See Standard & Poor's Corp. v. Commodity Exch., Inc., 538 F. Supp. 1063 (S.D.N.Y. 1982) aff'd, Standard & Poor's Corp. v. Commodity Exch., Inc., 683 F.2d 704 (2d Cir. 1982)("Comex I" and "Comex II" respectively, or Comex); Board of Trade v. Dow Jones & Co., Inc., 98 Ill. 2d 109 (Ill. 1983)(Board of Trade). In Comex, the defendant, applied to the Commodity Futures Trading Commission to be a contract market for futures of the "Comex 500 Stock Index," which would use the same 500 stocks as the S&P 500 Index and the identical method of compilation. Comex II, 683 F.2d at 706. A futures contract is an obligation to purchase "a specific quantity of a particular commodity at a specified date in the future at a fixed price," the value of which is "keyed to broad-based stock indices." See Stephen J. Choi & Adam C. Pritchard, Behavioral Economics and the SEC, 56 Stan. L. Rev. 1, 73 (2003). S&P published its stock index (the S&P 500 Index) and licensed the rights to use the index values to other companies. The futures contracts based on this index were to be settled in cash, based on the day's closing value of the S&P 500 Index. Comex II, 683 F.2d at 706. The district court held that this was misappropriation of "the skills, expenditures, labor, and reputation of S&P in generating and producing the S&P 500 Index." Comex I, 538 F. Supp. at 1071.

Similarly, in the Illinois Supreme Court case, Board of Trade, the Chicago Board of Trade proposed to commence trading in "Chicago Board of Trade Portfolio Futures Contracts," based on indexes that the exchange admitted were identical in composition and calculation to the DJIA. The misappropriation claims in both Comex and Board of

5

Trade involved exchanges that directly copied the plaintiffs' indexes. The futures contracts could not exist without the indexes and directly relied on the indexes for settlement prices.

It is unclear that the Court in Comex would have reached the same decision today. In his concurrence in Comex II, Judge Jon O. Newman indicated that the decision should be read narrowly.

> When Standard & Poor's enters the business of publishing an index of selected stock issues, there can be little doubt that another company endeavoring to publish the same index would face liability for misappropriation no matter how it merchandised its product and would face liability for trademark infringement if its merchandising created a risk of confusion.... However, when Standard and Poor's makes its stock index known to the public, different, novel, and, in my judgment, close questions are presented when another company enters a business other than publishing of stock indices-here, the marketing of futures contracts-and in its business uses the Standard & Poor's index as a reference point-here, the settlement price for the contracts.

Comex II, 683 F.2d at 712. This suggests to me that an index's property rights may not extend to every product that happens to use the index only as a reference point. The property right may become further attenuated when the products offered have another basis for value that does not directly depend on an index for its very existence. ETFs have an additional basis for value in that they are worth the combined price of the stocks that comprise the fund, so, while they are still connected to the indexes they track, they do not rely solely on the index for their existence and value.

Both Comex and Board of Trade cite and rely on Int'l News Service v. Associated Press, 248 U.S. 215 (1918)("INS"). And Plaintiffs of course urge that I follow the reasoning in those cases. See Comex II, 683 F.2d at 710; Board of Trade, 98 Ill.2d at 117-18. The International News Service ("INS") facts in brief show that it took information gathered by the Associated Press ("AP") for its articles and news bulletins and prior to publication and furnished that information to its clients. As such, the information INS provided its clients was based on information gathered by its competitor. The Court found that INS misappropriated the material acquired by AP "as the result of

organization and expenditure of labor, skill, and money, and which is salable by [the AP] for money." INS, 248 U.S. at 239. The AP was found to have a property right in the news it collected and disseminated to its clients and was entitled to protection from reproduction and repackaging of the information it gathered. The Court limited use of this information to "any legitimate purpose not unreasonably interfering with [AP's] right to make merchandise of it." Id.

In this Circuit, however, precedent limits the scope of what can be held to be misappropriation. See Cheney Bros. V. Doris Silk Corp., 35 F.2d 279, 280 (2d Cir. 1929)(rejected the proposition that INS set down a general doctrine of misappropriation and was to cover cases with similar facts); G. Ricordi & Co. v. Haendler, 194 F.2d 914 (2d Cir. 1952)(INS to be "strictly confined to the facts then at bar"). In another "hot news" case, National Basketball Ass'n v. Morotola, Inc., 105 F.3d 841 (2d Cir. 1997)("NBA"), the most recent review of INS, the Circuit suggests that INS covers at most a defendant's copying of information gathered by the plaintiff in order to save the expense of gathering that information itself, and then use of that information to compete directly with a product or service offered by the plaintiff. Id. at 852 n.7. Although this was a copyright case the Court held that "INS has long been regarded with skepticism by many courts and scholars and often confined strictly to its facts." Id.

In contrast, the Defendants rely on two more recent cases both closer to the facts here. Golden Nugget, Inc., v. American Stock Exch., Inc., 828 F.2d 586 (9th Cir. 1987); NASDAQ Stock Market, Inc., v. Archipelago Holdings, LLC, 336 F. Supp. 2d 294 (S.D.N.Y. 2004). These cases when read together make it difficult for Plaintiffs to sustain their claims against the Defendants.

In Golden Nugget, the Ninth Circuit affirmed dismissal and declined to find that an issuer retained any property right in its stocks or stock options, once they were issued and sold. 828 F.2d 586. Golden Nugget, a publicly listed corporation, sued the American Stock Exchange, Inc. ("AMEX") for trading options in Golden Nugget's stock without permission. The Ninth Circuit held that Golden Nugget's success was dependent on its ability to show that it had a property or other protectible interest in its common

7

stock owned by its shareholders and after a review of the facts concluded that it was "impossible to conceptualize a property right of the plaintiff that has been misappropriated." Id. at 590. Likewise, the Ninth Circuit found the plaintiff's trademark claims were equally unsuccessful.

> Surely a dealer in a product can describe it accurately by its trade name – shares of Golden Nugget common stock are not unlike second-hand BMW's or Chevrolets. Describing the product nondeceptively and by name brand has never been a violation of a manufacturer's trademark. We see no distinction between shares of stock and second-hand cars in this regard. We reject appellant's argument that Golden Nugget options are a new product, distinct and separate from Golden Nugget stock, that has appropriated the Golden Nugget name.

Id. at 591. Finally, the Court rejected Golden Nugget's unfair competition claim, and noted that to sustain this claim, there would have to be some grounding in deception or appropriation of plaintiff's property. Id.

Accordingly, Golden Nugget relinquished any property right it had in its stocks and stock options when it sold the stock to its shareholders because it no longer controlled the manner of resale. Id.

Whether the resale of ETFs are similar to the purchase and sale of stock options (where according to Golden Nugget the issuer retains no property rights) or to stock index futures contracts (where according to Board of Trade an index does retain property rights) was the key issue in NASDAQ, 336 F. Supp. 2d 294. NASDAQ created the "Nasdaq-100 Index" and subsequently created and licensed the right to sell ETFs based on that index. Id. at 297. ETFs, the district court noted, were like stocks in that the units or shares "are bought and sold in the secondary market like ordinary shares of stock." Id. The court concluded, "the defendants have not copied the Index or created a product--such as a futures contract--that is linked to the Index." Id. at 303. More to the point, the court found that the investors are the ones who use the index to set the price for the ETFs. Id. at 303 "[T]he index is publicly available information and those who use it to set the

price for the [ETF] shares they trade are investors and not the defendants." Id. Accordingly, insofar as the ETFs were not created but simply resold, and the corporation that created the ETFs did not retain control over the manner of resale, the corporation did not retain a property right in the ETFs after they were issued and sold. It follows then that the creator of an ETF fund will not retain a proprietary interest when options on the fund are offered in the secondary market.

### B. Dow's Preliminary Injunction
#### i. Applicable Legal Standard

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." To obtain relief pursuant to Rule 65, the moving party must clearly demonstrate: "(1) irreparable harm; and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to he merits and a balance of hardships tipping decidedly in favor of the movant." See Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza, No. 04 Civ. 7643, 2004 WL 2290900, at *2 (S.D.N.Y. Oct. 12, 2004)(Baer, J.). When it decides whether or not to issue a preliminary injunction, the Court must also give consideration to the public interest. See Rodriguez v. DeBuono, 175 F.3d 227, 233 (2d Cir. 1999).

#### ii. Irreparable Harm

To meet the standard for a preliminary injunction, Dow is required to show that irreparable injury is "likely," and is "neither remote nor speculative, but actual and imminent and … cannot be remedied by an award of monetary damages." Id. at 234.

Dow argues that it is entitled to a presumption of irreparable injury because it is claiming interference with its intellectual property. This presumption only exists in limited circumstances such as the irretrievable loss of property or where the movant is an owner or licensee of an exclusive property right that others may not use. See Andersen Consulting LLP v. Am. Mgmt. Sys., Inc., 1995 U.S. Dist. LEXIS 12417, at *9-10 (S.D.N.Y. Aug. 28, 1995). This presumption is extinguished when the owner or licensee

9

has allowed others to use the property. Am. Metro. Enters., Inc. v. Warner Bros. Records, Inc., 389 F.2d 903, 905 (2d Cir. 1968). Dow already allows others to use any potential property rights in DIAMONDS because it allows CBOE to sell options and has consented to subsequent resale of the ETF shares in the secondary market without a further license, so no presumption of irreparable injury applies.

To show the irreparable injury it believes likely to result if ISE were permitted to trade unlicensed DIAMOND options on its exchange, Dow argues it would lose control over the DJIA mark and its related marks, and there would be no way to measure the extent of that harm. This argument is unavailing because, to my way of thinking, it appears that the only actual and imminent harm Dow Jones will face is the loss of license fees it would receive and this sort of harm is easily and frequently remedied by damages. The same is true for any harm caused to CBOE as the result of the loss of its exclusive bargained-for right to trade ETF options on DIAMONDS.

Dow also contends that ISE's issuance of DIAMOND options would likely confuse the public into a belief that a relationship exists between Dow and ISE. To carry this burden there must be a substantial likelihood of confusion, see Brennan's, Inc. v. Brennan's Restaurant, L.L.C., 360 F.3d 125, 130 (2d Cir. 2004), and the proof at the hearing failed to show that this likelihood exists. In addition to public confusion, Dow argues that the public will suffer irreparable injury because, if Dow wins, purchasers of the DIAMONDS options might be locked into their contracts and injured, without a remedy. Again, 'where's the beef'? There was none at the hearing.

The same is true for Dow's argument that absent licenses for ETF options, Dow will have no incentive to create indexes and no obligation to give notice to investors in the event it decides to cease publication of an index. Dow reasons that the public would then be harmed because investors won't be able to unwind open positions before the index disappears. Let me add, since this case is all about bets, that I'd bet against this prospect in a heartbeat. The creation of ETFs and other products based on the DJIA where Dow still enjoys a property right and the right to collect license fees, etc., etc., provides incentives sufficient for Dow to maintain the DJIA and its other indexes.

### iii. Likelihood of Success

The ETF as a security instrument, and options thereof, fall somewhere in between the common stock discussed in Golden Nugget and the index futures contracts that were the subject of Board of Trade. DIAMONDS are shares of a fund that are traded like stock and can be bought and sold on the secondary market, but the value of DIAMONDS is nearly parallel to the value of the DJIA which gives the ETF some characteristics similar to a futures contract in that it tracks along with its corresponding index's averages.

Dow argues that Comex, and Board of Trade are dispositive, that "use" of an index requires a license, and that right extends to all derivative trading products that reference an index, but this is too broad a reading of these cases. There are decisive differences between ETF options and the futures contracts that were the subject of Comex and Board of Trade. Index futures are essentially a bet on how the market will perform. They are inextricably linked to the index number and have no independent value. This is a critical difference from ETFs where there is an underlying basket of securities. Value of an ETF is found in the underlying securities that comprise it. Even in the far fetched event that Dow was to cease to provide the DJIA, those stocks that comprise the ETF would not lose their value because the value of the underlying stocks would remain.

Dow argues that to offer options on the DIAMONDS ETF constitutes the creation of a new product, but this is not accurate. As the Ninth Circuit held in Golden Nugget, an option is not the creation of a new product, the product is the ETF which has been created by the index provider; the option is merely an opportunity to buy or sell the ETF. Golden Nugget, 828 F.2d at 303. Dow argues that options are not traded that way in reality because investors use them to hedge equity positions and rarely settle them with delivery of the shares. Rather, they are used much the same as an index future or index options where the only way to settle those options is through the payment of cash.

As Golden Nugget and Archipelago establish, Dow has no property right in the physical shares of DIAMONDS once they are sold to the investing public, and therefore

has no right to prevent the public from trading on the exchange of their choice. The result is the same when options on DIAMONDS are involved. As a legal matter, these options are simply conditional contracts made by private parties to buy or sell shares of DIAMONDS on or before a specified time. This is so no matter what the reality is by way of settlement.

The proof at the hearing showed that an exchange that lists DIAMONDS options, and OCC, by clearing DIAMONDS options trades, neither traces the DJIA stocks nor makes use of the DJIA index values to set prices or settle trades. (William Navin Decl. ¶¶11-14; Gary Katz, Tr. at 77, June 8, 2005; Richard Dufour, Tr. at 110, 131, June 13, 2005). While investors may conceivably make use of the DJIA index values to decide what to pay for these options this does not infringe any rights of Dow Jones.

Dow tries to liken index options on the DJIA to options on DIAMONDS and argues that investors don't know the difference between ETF options and index options and treat them the same way, meaning that options on DIAMONDS are not really about the transfer of DIAMONDS shares, but are a means of speculating on the rise and fall of the DJIA, just like the index options. Even if true, and it is far more likely in my view that these are sophisticated investors who know precisely what they are doing, the fact remains that there is a difference between an index option that literally disappears without the index, and an option on an ETF, which is comprised of a bundle of stocks that still retain value even if the index they track ceases to exist.

Dow also argues that the reality is that ETF options are settled the same way as the index options, through a cash payment rather than the exercise of the shares, but this argument is unavailing. The Ninth Circuit's reasoning on this point is persuasive. The fact that some options are not exercised is not significant. See Golden Nugget, 828 F.2d at 591. An option is merely the right to buy or sell shares and the underlying obligation of the options contract remains in effect no matter how they are settled.

Based on the above, Dow has not shown the requisite irreparable harm or either a likelihood of success or a serious question going to the merits of the claims to meet the burden necessary to warrant preliminary relief.

### C. Motion to Dismiss

#### i. Applicable Legal Standard

Rule 8(a) requires that a plaintiff provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. Rule 8(a). A court may dismiss an action for failure to state a claim pursuant to Rule 12(b)(6) only if "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997). In construing the complaint, the court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." Id. "Given the Federal Rules' simplified standard for pleading, a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 514 (2002).

In addition to the pleadings, the court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)(citation omitted). A court may take judicial notice of a public record pursuant to Fed. R. Evid. Rule 201(b). Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000).

#### ii. SPDR Options

The issues of law and fact with regard to ISE's attempt to offer SPDRs options are nearly identical to the ones described above with regard to Dow's motion for a preliminary injunction. Certainly McGraw-Hill enjoys a cognizable intellectual property right in the S&P index itself and S&P's marks. ISE does not dispute this, but it is also true that the right does not necessarily extend to options on its ETF, SPDRs. This is an issue of law capable of resolution in this Motion to Dismiss.

With regard to its misappropriation and unfair competition claims, McGraw-Hill argues that a property right exists in the index itself and that if the S&P 500 were

discontinued, there would be no value to the ETF as a whole. But as discussed above, while there is some value conferred to an ETF by virtue of tracking a particular index, that value does not entirely disappear if by some unlikely occurrence the index stopped its publication. Rather, the value and property rights remain in the ownership of shares in the fund. Golden Nugget, 828 F.2d at 591. So despite McGraw-Hill's arguments, as far as options of an ETF are concerned, their very existence and value do not depend solely on the skills, creativity, labor and investment of resources of the index provider. Options on SPDRs are merely a right to buy or sell shares of SPDRs at a determined price on or before a stated time. The fact that SPDRs are a product licensed by McGraw-Hill does not convey any property rights in SPDRs once they are purchased by investors in the secondary market. McGraw-Hill may not control how or where investors resell their SPDR shares – including conditional resale through option contracts. Archipelago, 336 F. Supp. 2d 294.

McGraw-Hill's trademark claims, asserted under the Lanham Act, the New York anti-dilution statute, and New York common law, assert that ISE's use of "SPDR" to identify the SPDR options traded on ISE is an infringement of the S&P Marks and dilutes those marks. To describe a product non-deceptively is not a violation of trademark law. Golden Nugget, 828 F.2d at 591. So long as ISE merely lists SPDR options by using the terms "SPDR" or "Standard & Poor's Depositary Receipts," there is no infringement of S&P's marks.

### III. CONCLUSION

For the foregoing reasons, the motion for a Preliminary Injunction is DENIED and the Motion to Dismiss is GRANTED. McGraw-Hill's claims are dismissed against ISE and if a similar motion is made with respect to Dow's allegations against ISE and OCC, it will likely come to the same result. The Clerk of the Court is instructed to close these motions and remove them from my docket.

SO ORDERED
New York, NY
September ___, 2005

_____
U.S.D.J.

14